BERNARD R. HOUSE AND KATHRYN R. HOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
House v. Commissioner
Docket Nos. 239-88, 8884-90
United States Tax Court
T.C. Memo 1995-92; 1995 Tax Ct. Memo LEXIS 96; 69 T.C.M. (CCH) 2005; March 6, 1995, Filed *96 Decisions will be entered under Rule 155. For petitioners: B. Gray Gibbs. For respondent: Willie Fortenberry, Jr.
CLAPP
CLAPP
MEMORANDUM OPINION CLAPP, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: Docket No. 239-88
Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) Sec. 6653(b)(2) Sec. 6661 1983
$ 80,364
$ 40,182
[1]
$ 20,091
Docket No. 8884-90
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b) 6653(b)(1)
6653(b)(2)
6661
1979
$ 41,820.28
$ 20,910.14
--
--
--
1980
208,847.72
104,274.06
--
--
--
1981
110,747.65
55,373.83
--
--
--
1982
87,798.37
--
$ 43,899.19
[1]
$ 21,949.59
1984
59,690.00
--
29,845.00
[2]
14,922.50
1985
71,620.35
--
35,593.68
[3]
17,905.09
By amendments to answer, respondent asserted the following increased deficiencies and additions to tax: Docket No. 239-88
Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) Sec. 6653(b)(2) Sec. 6661 1983
$ 54,073.28
$ 27,036.64
[1]
$ 13,518.32
*97 Docket No. 8884-90
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
1981
$ 20,981.81
$ 10,990.91
--
--
--
1982
32,898.67
--
$ 16,449.34
[1]
$ 8,224.67
1985
14,747.91
--
7,373.96
[2]
3,686.98
These cases were consolidated for purposes of trial, briefing, and opinion. After concessions by the parties, the issues for decision are: (1) Whether petitioners failed to report Schedule C gross receipts from the construction and sale of property in the years at issue, and whether petitioners had Schedule C cost of goods sold in excess of amounts allowed by respondent. We hold that petitioners failed to report Schedule C gross receipts in the years at issue. We further hold that, in some instances, petitioners had cost of goods sold in excess of the amounts allowed by respondent. (2) Whether petitioners are entitled to Schedule C construction expenses in excess of amounts allowed by respondent in 1979, 1981, and 1982. We hold that, except in the case of car and truck *98 expenses, petitioners are not entitled to construction expenses in excess of amounts allowed by respondent. (3) Whether petitioners underreported income from rental properties during the years 1979, 1980, 1981, 1982, 1984 and 1985. We hold that they did. (4) Whether petitioners are entitled to deductions for rental property expenses in 1979, 1980, 1983, 1984, and 1985, respectively, and for depreciation in 1979 and 1980 in excess of amounts allowed by respondent. We hold that petitioners are not entitled to deductions for rental property expenses or depreciation in excess of amounts determined by respondent. (5) Whether petitioners are entitled to a depreciation deduction of $ 7,551 in connection with the Bagel King for 1983. We hold that they are not. (6) Whether petitioners failed to report taxable capital gain income in 1979, 1980, 1981, 1983, 1984, and 1985. We hold that they did. (7) Whether petitioners failed to report income of $ 47,250 from discharge of indebtedness in 1980. We hold that petitioners did not have income from discharge of indebtedness in 1980. (8) Whether petitioners failed to report income received from Lounge Enterprises, Inc. (Lounge Enterprises), *99 and Executive Motor Lodge, Inc. (Executive Motor Lodge). We hold that they failed to report income received from both corporations. (9) Whether petitioners are entitled to itemized deductions of $ 1,980 for 1985. We hold that they are not. (10) Whether petitioners are liable for fraud additions to tax under section 6653(b) for 1979, 1980, and 1981 and under section 6653(b)(1) and (2) for 1982, 1983, 1984, and 1985. We hold that Bernard R. House (petitioner) is liable for fraud additions to tax for all the years in issue, but Kathryn R. House (Mrs. House) is not. (11) Whether petitioners are liable for additions to tax under section 6661 for 1982, 1983, 1984, and 1985. We hold that they are. (12) Whether the statute of limitations bars the assessment and collection of income taxes for the taxable years 1979, 1980, 1981, and 1982. We hold that the proposed assessments are not barred by the statute of limitations. (13) Whether Mrs. House is an innocent spouse within the meaning of section 6013(e) for the years in issue. We hold that Mrs. House does not qualify as an innocent spouse. Respondent concedes that petitioners are entitled to additional personal exemptions in the *100 amounts of $ 3,000 and $ 2,000 for the years 1979 and 1980, respectively. Respondent also concedes that petitioners are entitled to investment tax credits of $ 2,186 in 1981 and $ 850 in 1985. Other concessions by respondent are noted where appropriate in this opinion. Petitioners have conceded the following issues: (1) The statute of limitations does not bar the assessment and collection of taxes for 1983, 1984, and 1985. (2) Petitioners are not entitled to the $ 500 earned income credit claimed on their 1979 return. (3) Petitioners are not entitled to the $ 24,800 rehabilitation expenditure credit claimed on their 1985 return. (4) Petitioners failed to report wages received in 1980 and 1985 in the amounts of $ 4,900 and $ 6,525, respectively. (5) Petitioners concede that they had unreported interest income of $ 1,210.83, $ 1,196.09, $ 3,201.72, $ 23,220.89, $ 32,571, and $ 4,050 for 1979, 1980, 1981, 1982, 1983, and 1985, respectively. (6) Petitioners concede that they are liable for self-employment taxes for the years 1979 through 1985 under section 1401 on income from Schedule C operations to the extent that the Court determines that income was unreported. All section *101 references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. For convenience, we have combined our findings of fact and opinion with respect to the issues involved in these cases. Some facts have been stipulated and are found accordingly. We incorporate by reference the stipulation of facts, first and second supplemental stipulations of facts, and attached exhibits. Petitioners resided in St. Petersburg, Florida, and were husband and wife at the time they filed their petitions in these cases. Although the resolution of the statute of limitations issue in petitioners' favor for any year would be dispositive of the issues for that year, we believe it preferable to first discuss the underlying factual issues, since they also bear on whether the fraud exception applies to the normal 3-year period of limitations. Respondent's determination is generally presumed correct, and petitioners bear the burden of proving that determination incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent, however, has the burden *102 with respect to the increased deficiencies. Rule 142(a). As discussed in those portions of the opinion dealing with fraud, the presumption of correctness does not apply to respondent's allegations of fraud for purposes of sections 6501(c) and 6653(b). As explained, infra, we hold that none of the proposed assessments for the years in issue are barred by the statute of limitations. Background
Petitioner's formal education ended after he completed the 11th grade in high school. After leaving school, he worked as a clerk for a trucking company in Baltimore, Maryland. Petitioner remained in the trucking industry until 1970. In approximately 1971, petitioners moved to Florida, where petitioner became involved in the construction business. From approximately 1973 to 1977, petitioner operated First Sun Coast Construction Co. (First Sun Coast). During the years in issue, petitioner was engaged in a variety of business enterprises, including residential construction and sales, residential rentals, residential investments, motel, restaurant, and lounge operations. From 1977 to 1983, petitioner employed Robert S. Welsh (Welsh) as an accountant for his businesses and to prepare *103 petitioners' personal returns. According to petitioner, he provided Welsh with all records and information he had regarding his various business transactions from which Welsh prepared a return which petitioner reviewed. Petitioners allege that, each year, Welsh asked petitioners to sign a blank return explaining that he would transpose the figures onto the signed return, but then transferred different numbers to the signed return. Petitioners claim that Welsh filed the signed return without further review by petitioners. Welsh did not sign any of petitioners' returns as preparer. For matters unrelated to petitioners, Welsh was later convicted of filing fraudulent income tax returns for 1984 and 1985. In 1983, petitioners stopped employing Welsh and hired another accountant, Peter VanSon (VanSon) to prepare petitioners' returns. VanSon signed petitioners' 1983, 1984, and 1985 returns as preparer. During 1987, an eight-count criminal indictment was filed against petitioner in the U. S. District Court, Middle District of Florida, Tampa Division. Through plea bargaining proceedings, petitioner voluntarily pled guilty to count 2 of the indictment, a violation of section 7206(1), *104 which states that petitioner -- did willfully make and subscribe a 1980 United States Individual Income Tax Return (I.R.S. Form 1040), which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Director, Internal Revenue Service Center at Atlanta, Georgia which 1980 United States Individual Income Tax Return (I.R.S. Form 1040) he did not believe to be true and correct as to every material matter in that in the said 1980 United States Individual Income Tax Return (I.R.S. Form 1040) no gross sales from a construction business were reported, no sales of real estate were reported, and no sales of businesses were reported, whereas, as he then and there well knew and believed that his construction business generated gross sales, he sold real estate and he sold businesses.
For many of the transactions in these cases, petitioners are unable to provide much, if any, documentation. This is particularly true with respect to their expenses, cost of goods sold, and bases. Petitioners concede that petitioner was sloppy in his recordkeeping and that he kept his records in his car. Petitioners blame Welsh, however, for the loss of *105 most of the financial records for petitioners' businesses. Petitioners stated that Welsh kept most of their records and failed to return all of the records to them. Petitioner testified that he turned over to the Internal Revenue Service (IRS) all records that Welsh returned to him and which petitioner had in his possession. Petitioner explained that the remaining records were either never recovered from Welsh or were lost in Hurricane Elena. Issue 1. Unreported Schedule C Income
The first issue for our decision, which relates to petitioner's residential construction and sales business, is whether petitioners failed to report gross receipts, and whether petitioners have established entitlement to costs of goods sold in excess of amounts determined by respondent. Respondent's determinations are summarized as follows: Year
Total Gross
Gross Receipts
Unreported Gross
Cost of Receipts Reported
Receipts
Goods Sold
1979
$ 160,000.00
$ 24,116.00
$ 135,884.00
$ 128,568.00
1980
358,000.00
--
358,000.00
289,279.53
1981
451,517.00
62,591.26
388,925.74
371,550.45
1982
128,400.00
--
128,400.00
94,610.40
1983
164,500.00
--
164,500.00
154,455.85
1984
190,000.00
--
190,000.00
162,350.00
1985
42,500.00
--
42,500.00
[1] 50,000.00
*106 For many of the properties discussed below, petitioners claim that respondent's determinations of costs of goods sold are too low. With respect to costs of goods sold, and in other instances expenses, petitioners ask the Court to estimate the amounts allowable. Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled to any deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111 (1933). This includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). A taxpayer is required to maintain records sufficient to establish the amount of his or her income and deductions. Sec. 6001. As a general rule, if the record provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of such expense and allow *107 the deduction to that extent. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), affg. in part and modifying and remanding in part 11 B.T.A. 743 (1928). We may also, in appropriate circumstances, estimate a taxpayer's cost of goods sold. See Estate of Stein v. Commissioner, 25 T.C. 940, 957 (1956), affd. per curiam sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). However, in order for the Court to estimate the amount of an expense or a cost of goods sold, we must have some basis upon which an estimate can be made. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Without such a basis, any allowance would amount to unguided largess. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). 1979
10113 Paradise Boulevard
The only property in issue with respect to petitioners' 1979 Schedule C construction income is 10113 Paradise Boulevard, Treasure Island, Florida. The property was an empty lot, purchased in Mrs. House's name from James A. Glynn and Iris Glynn in *108 1977. According to petitioner, the lot was bought because it was believed that the Treasure Island authorities would give him a variance so that a special pool could be constructed for Mrs. House, who is confined to a wheelchair. Before receiving formal approval for the variance, petitioner constructed a 4,126-square-foot house and a pool. The variance was denied, and petitioner maintains that he had to tear out the original pool and build a new one. Petitioner testified that the original pool cost $ 12,000 to install, and he incurred another $ 5,000 expense in removing the pool. Petitioner also testified that he constructed a seawall and dock at a cost of about $ 5,000. Petitioners allege that they ultimately expended approximately $ 150,000 on the house, pool, and other improvements. In 1979, petitioners sold 10113 Paradise Boulevard to Barry A. Wax (Wax) and Laura R. Wax (the Waxes). The sales contract states that the Waxes bought the property for $ 160,000. As part of the purchase price, the Waxes traded to petitioners a property located at 1091 79th Street South, St. Petersburg, Florida, valued at approximately $ 100,000, subject to two mortgage notes totaling $ 60,000. *109 The Waxes had approximately $ 40,000 of equity in the 1091 79th Street house. In addition, petitioners received a $ 30,000 personal note from Wax as the downpayment, and a $ 90,000 note secured by a mortgage. Petitioners did not report the sale of 10113 Paradise Boulevard on their 1979 return. Respondent determined that petitioners had gross receipts of $ 160,000 from the sale of 10113 Paradise Boulevard. Respondent also determined that the land cost $ 24,800, the house cost $ 102,568, and the expenses of sale were $ 1,200, for a total cost basis of $ 128,568. Petitioners respond that they received only the trade house (1091 79th Street) and $ 66,000 of the $ 90,000 mortgage note in 1979. Nevertheless, petitioner's testimony as to when the sales proceeds were received was vague, and petitioners produced no records. Petitioner's testimony with regard to receipt of the proceeds of the $ 30,000 personal note was unclear, but seemed to suggest that he never received the money. Wax testified that he paid petitioners the $ 30,000 in 1981 or 1982. On brief, petitioners explain that the house was not completed at the time Wax purchased it, so Wax deducted the costs of completion *110 from the $ 90,000 mortgage note. The contract of sale states: "Seller to complete to specification, 4 bedroom, 3 bath, 4,200 sq. feet home with Pool, dock, carpet and appliances." Also in the contract of sale, under a heading "Credits to borrower for items unpaid by seller" is the notation "Holdback $ 24,000.00". Wax testified that he "held back" $ 24,000 of the $ 90,000 mortgage note to cover the costs of completing the house. Wax explained that petitioners eventually received the $ 24,000, less the costs of completion; however, he could not remember how much the costs of completion were. Petitioner did not testify regarding the costs of completion, stating only that he received the $ 90,000 at the closing, plus the trade house. We find that petitioners have not demonstrated that either the personal note or the mortgage note was worth less than its fair market value. Thus, we hold that petitioners received $ 160,000 for the 10113 Paradise Boulevard property. Petitioners also contend that they expended approximately $ 150,000 on improvements to the 10113 Paradise Boulevard property, and thus that respondent has underestimated their cost basis. Petitioners have not submitted *111 any documentation to support their argument, and the little evidence available casts some doubt on the accuracy of petitioner's memory with respect to this property. Specifically, petitioner testified that he had a seawall and dock built for the property at a cost of approximately $ 5,000. However, there is a document attached to a stipulated warranty deed for the property giving some relevant information about the house that states that there is no seawall. In view of such conflicting evidence, we hold that petitioners have not demonstrated that respondent underestimated their cost basis. We sustain respondent's determination with regard to 10113 Paradise Boulevard. 1980
1091 79th Street South
After receiving the 1091 79th Street property in trade for 10113 Paradise Boulevard, petitioners left 1091 79th Street titled in the Waxes' names until it was sold in 1980. According to Wax and petitioner, this was done for convenience. The 1091 79th Street property was sold for $ 107,500 on September 5, 1980, to Bruno Roman and Phyllis M. Roman (the Romans). Petitioners did not report the sale of the 1091 79th Street property on their 1980 return. Respondent determined *112 that the cost basis of the land and house was $ 95,382.92 and the closing costs were $ 5,821.25, for a total cost basis of $ 101,204.17. Both petitioner and Wax testified that they agreed at the time of the sale that 1091 79th Street was worth $ 100,000, with $ 40,000 of equity and subject to two mortgage notes totaling $ 60,000. Petitioner estimated that he made approximately $ 6,000 in improvements to the 1091 79th Street house and lot before it was sold to the Romans. Wax also testified that petitioner made improvements to 1091 79th Street, although he was unsure of the cost. Wax and petitioner both testified that petitioner made all the mortgage payments on 1091 79th Street during the 13 months he owned the property. We find that petitioners have established that their cost basis in 1091 79th Street totaled $ 111,821.25 ($ 100,000 purchase price + $ 6,000 improvements + $ 5,821.25 closing costs). Consequently, we hold that petitioners sustained a loss of $ 4,321.25 on the sale of 1091 79th Street in 1980. Lots 1 Through 6 Grand Arcade Subdivision
On October 31, 1980, lots 1 through 6, block H, Grand Arcade subdivision (the Grand Arcade properties), titled in the name *113 Chris E. Reynolds were sold to Leisure Living Homes, Inc., for $ 18,000. Chris Reynolds is petitioners' son-in-law. The parties stipulated that Chris Reynolds had no interest in the Grand Arcade properties and held them as nominee of petitioner. Petitioners did not report the sale of the Grand Arcade properties on their 1980 return. Respondent determined that petitioners' cost basis in the Grand Arcade properties was $ 9,935. Petitioners do not dispute the selling price or the cost basis of the Grand Arcade properties. Accordingly, we sustain respondent's determinations. Lots 7 Through 12, Interurban Park
On October 31, 1980, lots 7 through 12, inclusive, Interurban Park (the Interurban properties), titled in the name Beverly J. Reynolds, were sold to Leisure Living Homes, Inc., for $ 18,000. Beverly Reynolds is petitioners' daughter. The parties stipulated that Beverly Reynolds had no interest in the Interurban properties and held them as nominee of petitioner. Petitioners did not report the sale of the Interurban properties on their 1980 return. Respondent determined that petitioners' cost basis in the Interurban properties was $ 10,035. Petitioners do not dispute *114 the selling price or the cost basis of the Interurban properties. We sustain respondent's determination of unreported gross receipts and cost basis for the Interurban properties. 6089 72d Avenue North and 6059 72d Avenue North
In 1980, petitioner sold 6089 72d Avenue North, Pinellas Park, Florida, to David D. Bright and Patricia J. Bright (the Brights), and 6059 72d Avenue North, Pinellas Park, Florida, to David D. Bright. Petitioner originally bought the properties as unimproved lots and then built a 1,600-square-foot duplex on each. Petitioner sold each property for $ 62,500, but did not report the sales on petitioners' 1980 return. Respondent determined that petitioners had a cost basis of $ 46,911 for 6089 72d Avenue and $ 45,355.08 for 6059 72d Avenue. Petitioner testified that, in order to prepare each lot for building, he had to spend between $ 2,800 and $ 3,000 to grade the lots and put in new culverts and new crossover lines. Petitioner also testified that the duplexes were each 1,600 square feet and cost between $ 26 and $ 28 per foot to build. We are satisfied that petitioner spent $ 2,800 on each lot in preparation for construction, and spent $ 26 per square *115 foot on construction of the duplexes. Respondent determined that petitioner paid $ 7,000 for the unimproved lot at 6089 72d Avenue North, and $ 7,525.63 for the unimproved lot at 6059 72d Avenue North. Respondent allowed $ 472.75 as closing costs for the sale of 6089 72d Avenue North, and $ 490.25 for the sale of 6059 72d Avenue North. Accordingly, we hold that petitioners' costs for 6089 72d Avenue North totaled $ 51,872.75 ($ 7,000 cost of lot $ 2,800 preparation of lot + $ 41,600 cost to build duplex + $ 472.75 closing costs), and for 6059 72d Avenue North totaled $ 52,415.88 ($ 7,525.63 cost of lot + $ 2,800 preparation of lot + $ 41,600 cost to build duplex + $ 490.25 closing costs). Petitioner contends that he did not receive the full $ 62,500 contract price on the sale of each property; however, he presented no evidence to support this claim. We sustain respondent's determination with regard to the gross receipts collected from the two properties. 6051 72d Avenue North
In 1980, petitioner sold 6051 72d Avenue North, Pinellas Park, Florida, to Harvey Lee Condon and Doris A. Condon for $ 62,500. Petitioners did not report the sale on their 1980 return. Respondent *116 determined that petitioners had a cost basis of $ 49,799.03 for 6051 72d Avenue. Petitioners do not challenge respondent's cost basis determination, but argue that they did not receive the full $ 62,500 on the sale of the property. Petitioners presented no evidence to support this claim. We therefore sustain respondent's determinations with regard to the sale of 6051 72d Avenue North. Lots 8 and 48, Bay Ridge Heights
Quality Home Builders, Inc. (Quality Home Builders), a subchapter S corporation, was incorporated on July 1, 1977. Petitioner was the sole shareholder of Quality Home Builders, which was engaged in residential investments, including investments in unimproved real property. The State of Florida dissolved Quality Home Builders in 1978. In 1978, but prior to its dissolution, Quality Home Builders purchased seven lots, including lots 8 and 48 at Bay Ridge Heights, No. 2, Pinellas County, Florida, from Albert C. Hall and Betty J. Hall (the Halls) for $ 78,000. Each lot's pro rata value was slightly more than $ 11,000 before improvements. Petitioner's intention was that Quality Home Builders would purchase and improve the lots, and a business acquaintance, Larry *117 Lashley, (Lashley) would construct homes on the lots. Petitioner and Lashley were to split the profits. Petitioner and Lashley decided not to complete the deal and, in 1980, lots 8 and 48, Bay Ridge Heights, were sold to Lashley and his wife, Geraldine Lashley. According to the indenture, lots 8 and 48, Bay Ridge Heights, were titled in the name of Quality Home Builders at the time of the sale. Petitioner contends that the selling price for each lot was $ 11,000, but that Lashley never paid any money for the lots. Petitioner maintains that Quality Home Builders gave Lashley the property in lieu of compensation that was owed him. Petitioners acknowledged that the sales were not reported on their 1980 return. Respondent determined that petitioners received $ 11,000 in gross receipts on the sale of lot 48 and $ 10,000 on the sale of lot 8. Respondent also determined that petitioners' costs with respect to lot 48 totaled $ 11,142.85 and with respect to lot 8 totaled $ 11,142.85. Petitioners have not established that the fair market value of the debt owed to Lashley was less than the amount determined by respondent as the selling price for lots 8 and 48, Bay Ridge Heights. Consequently, *118 we sustain respondent's determination with regard to the gross receipts from, and cost basis of, lots 8 and 48, Bay Ridge Heights. Lot 8, Security Acres
In 1980, petitioner sold lot 8, Security Acres Section D, to John R. Connell (Connell) for $ 6,000. Petitioners failed to report this sale on their 1980 return. Respondent determined that petitioners received $ 6,000 in gross receipts from the sale of lot 8, Security Acres, and had $ 3,653 in total costs. Petitioner testified that he received services from Connell in lieu of cash; however, petitioner presented no credible evidence to refute respondent's determinations that petitioners received $ 6,000 in gross receipts or that they were entitled to a higher cost basis. Consequently, respondent's determinations are sustained. 1981
Lots 9 and 10, Bay Ridge Heights
In 1981, petitioner sold lots 9 and 10, Bay Ridge Heights, No. 2, 13160 87th Avenue North, Seminole, Florida, to the Brights. Lots 9 and 10, Bay Ridge Heights were part of the 1978 seven-lot purchase by Quality Home Builders from the Halls. At the time of the sale, the property was titled in the name of Quality Home Builders, which was then defunct. *119 Petitioners failed to report the sale of lots 9 and 10, Bay Ridge Heights, on their 1981 return. Respondent determined that petitioners received $ 86,517 in gross receipts on the sale of lots 9 and 10, Bay Ridge Heights, and had a cost basis of $ 72,096.85 ($ 11,142.85 for the land + $ 60,546 for the house + $ 408 closing costs). Petitioners contend that respondent has underestimated their cost basis. Quality Home Builders bought the seven lots for $ 78,000. Petitioner testified that he spent between $ 2,200 and $ 2,500 to prepare the lots for building. He also testified that he built a one-story home of approximately 2,000 square feet that had three or four bedrooms, two baths, a two-car garage, a pool and decking, and a lanai. Petitioner explained that the house cost between $ 26 and $ 28 per square foot to build, and the pool, decking, and lanai cost at least $ 10,000. Consequently, petitioners contend that their cost basis in the house and pool was at least $ 60,546. Although petitioner provided no documentation to support the claimed expenditures for the house and pool area, his testimony was sufficiently specific for us to estimate petitioners' cost basis for the property. *120 We are satisfied that petitioner spent $ 2,200 on the lots in preparation for construction, $ 26 per square foot on construction of the house, and $ 10,000 on the pool, decking, and lanai. Respondent determined that petitioner paid $ 11,142.85 for the property. Respondent allowed $ 408 as closing costs for the sale of lots 9 and 10, Bay Ridge Heights. Accordingly, we hold that petitioners' costs for lots 9 and 10, Bay Ridge Heights totaled $ 75,750.85 ($ 11,142.85 cost of unimproved land + $ 2,200 preparation of lots for construction + $ 52,000 cost to build a 2,000 square foot house + $ 10,000 pool, decking and lanai + $ 408 closing costs). Although the closing statement for the sale of lots 9 and 10, Bay Ridge Heights, showed a purchase price of $ 93,500, respondent determined that petitioners received only $ 86,517 on the sale. Petitioners do not challenge respondent's determination regarding their gross receipts. Accordingly, respondent's determination with regard to the unreported gross receipts from the sale of lots 9 and 10, Bay Ridge Heights is sustained. 10109 Paradise Boulevard
In 1981, petitioner sold property located at 10109 Paradise Boulevard to Dianne M. *121 Greene (Greene), who managed several of petitioner's businesses, and her husband, Robert Greene. Petitioners did not report the sale on their 1981 return. Respondent determined that petitioners received $ 210,000 in gross receipts on the sale. Respondent also determined that petitioner spent $ 33,000 for the lot, $ 125,578 for construction of the house, and $ 6,272.90 for closing costs, for a total cost basis of $ 164,850.90. Petitioner argues that he spent more than $ 125,578 on construction of the house, but we find his testimony with regard to this property to be too vague to support an increase in the cost basis determined by respondent. Although the closing statement for 10109 Paradise Boulevard showed a purchase price of $ 200,000, both petitioner and Greene testified that the purchase price was actually $ 210,000. Both testified that part of the $ 210,000 was paid to Frank J. Guida (Guida), to whom petitioner owed money in connection with the house, although they disagree about the amount paid to Guida. Petitioner and Greene testified that the amounts used to pay Guida were taken from the earnings of Lounge Enterprises, a business owned by petitioner. Greene explained *122 that she actually only paid $ 150,000 for the 10109 Paradise Boulevard property because she was instructed by petitioner to pay the remaining $ 60,000 of the purchase price to Guida with funds from Lounge Enterprises, and she did not repay the $ 60,000 to Lounge Enterprises. Greene, who was later audited, could not remember whether the IRS eventually required her to report the $ 60,000 as income. Respondent argues that petitioners must recognize the $ 60,000 as part of the gross receipts from the sale of the property since the $ 60,000 was paid on petitioner's behalf to a third party. Petitioners contend that they received something less than $ 210,000 from the sale, and thus respondent's determination is incorrect. It is not clear from the record whether the $ 60,000 taken from Lounge Enterprises and paid to Guida should be characterized as dividend income to petitioners or something else. Whether the funds came from Greene or Lounge Enterprises, it appears that petitioner received the benefit of $ 60,000 that he did not have before the sale. In the absence of any showing by petitioners that they recognized the $ 60,000 in some other manner, we will sustain respondent's determination *123 that petitioners received $ 210,000 in gross receipts from the sale of 10109 Paradise Boulevard. 13227 and 13203 86th Avenue
In 1981, property located at 13227 86th Avenue North, Bay Ridge Heights No. 2, Seminole, Florida, was sold to Associates Realty Northwest, and property located at 13203 86th Avenue North, Bay Ridge Heights No. 2, Seminole, Florida, was sold to Paul J. Skipper (Skipper) and Joseph W. Klingel (Klingel). Both properties were part of the 1978 seven-lot purchase by Quality Home Builders from the Halls. At the time of the sales, both properties still were titled in the name of Quality Home Builders. Petitioners failed to report the sale of 13227 and 13203 86th Avenue on their 1981 return. Respondent determined that petitioners received $ 80,000 in gross receipts on the sale of 13227 86th Avenue and spent $ 11,142.85 for the unimproved land and $ 58,374 for the house and other improvements, for a total cost basis of $ 69,516.85 for that property. Respondent also determined that petitioners received $ 75,000 in gross receipts on the sale of 13203 86th Avenue and spent $ 11,142.85 for the unimproved land and $ 53,943 for the house and other improvements, for *124 a total cost basis of $ 65,085.85 for that property. Petitioners do not argue that they did not receive the full amounts of the purchase price, but challenge respondent's determination of gross receipts based on their contention that they only received about $ 5,000 for each property in 1981 and the balance was paid within 2 or 3 years. According to the closing statements, petitioners received a $ 5,000 downpayment for each property at the closing and, for both 13227 and 13203 86th Avenue, accepted wraparound mortgage notes for the balances of the purchase price. Petitioners have not claimed that the gain from these sales, or any of their other property sales, can be reported on the installment method. Petitioners have not demonstrated that the mortgage notes were worth less than their face values. Accordingly, we sustain respondent's determinations that petitioners received $ 80,000 and $ 75,000 in unreported gross receipts on the sales of 13227 and 13203 86th Avenue, respectively. Petitioners contend that respondent has underestimated their cost bases for both properties. Petitioner testified that he spent between $ 2,500 and $ 3,000 to prepare the sites for construction. *125 He also testified that on the lot at 13227 86th Avenue he built a house of approximately 2,120 square feet that had four bedrooms, a pool, decking, and a lanai. Petitioner stated that the house on the lot at 13203 86th Avenue had only three bedrooms and was 120 feet smaller than the 13227 86th Avenue house. The smaller house also had a pool, decking, and a lanai. Petitioner explained that each house cost between $ 26 and $ 28 per square foot to build, and the pool, decking, and lanai cost at least $ 10,000 for each property. Although petitioner provided no documentation to support the claimed expenditures for the properties, his testimony was sufficiently specific for us to estimate his cost bases. We are satisfied that petitioner spent at least $ 2,500 on each of the lots in preparation for construction, $ 26 per square foot on construction of the houses, and $ 10,000 on each property for the pool, decking, and lanai. Respondent determined that petitioner paid $ 11,142.85 for each of the properties. Accordingly, we hold that petitioners' costs for 13227 86th Avenue totaled $ 78,762.85 ($ 11,142.85 cost of unimproved land + $ 2,500 cost to prepare lots for construction + $ *126 55,120 cost to build a 2,120 square foot house + $ 10,000 pool, decking, and lanai). We hold that petitioners' costs for 13203 86th Avenue totaled $ 75,642.85 ($ 11,142.85 cost of unimproved land + $ 2,500 cost to prepare lots for construction + $ 52,000 cost to build a 2,000 square foot house + $ 10,000 pool, decking, and lanai). 1982
13195 86th Avenue
In 1982, petitioner sold 13195 86th Avenue, Bay Ridge Heights, Seminole, Florida, to a Mr. and Mrs. Kersting. The property was part of the 1978 seven-lot purchase by Quality Home Builders from the Halls. At the time of the sale, the property still was titled in the name of Quality Home Builders, which then was defunct. Petitioners failed to report the sale of 13195 86th Avenue on their 1982 return. Respondent determined that petitioners received $ 95,900 in gross receipts on the sale of 13195 86th Avenue and had a cost basis of $ 70,278.40. Petitioners do not challenge respondent's determination regarding the gross receipts received from the sale. Petitioners contend that their cost basis should be greater, but provide no documentation to support this claim, and petitioner's testimony was not sufficiently specific *127 to permit us to redetermine their investment in the property. Accordingly, respondent's determination with regard to this property is sustained. Lots in the Marini and Salvatore Subdivision
In 1982, petitioner sold lot 1, block 1, and lots 1 and 24, block 2, Marini and Salvatore Subdivision, to Skipper for $ 30,000. Petitioners failed to report the sale of these lots on their 1982 return. Respondent determined that petitioners received $ 30,000 in gross receipts on the sale of the lots in the Marini and Salvatore Subdivision and had a cost basis of $ 24,332. Petitioners argue, on brief, that they may not have received the full $ 30,000 in 1982. The only evidence presented on this issue was petitioner's testimony at trial, which was very vague, about when the proceeds of the sale might have been received. Petitioners have not succeeded in proving either that they did not receive the full $ 30,000 in 1982, or that the mortgage note they accepted at the time of the sale was worth less than its face value. Petitioners do not challenge respondent's determination regarding their cost basis. Accordingly, respondent's determination with regard to this property is sustained. *128 13196 87th Avenue
Respondent determined that petitioner received $ 2,500 in gross receipts when a deposit on property located at 13196 87th Avenue was forfeited in 1982. Petitioners presented no testimony or other evidence on this issue. Accordingly, respondent's determination is sustained. 1983
7733 Justin Court
In 1983, petitioner transferred title to property located at 7733 Justin Court, St. Petersburg, Florida, to the Brights. In 1984, the Brights transferred title to 7733 Justin Court to Jeffrey A. Kane and Elizabeth M. Kane (the Kanes). Respondent determined that petitioners received $ 104,500 in gross proceeds from the sale in 1983 to the Brights, and that petitioners received $ 90,000 in gross receipts from the sale in 1984 to the Kanes. Respondent also determined that petitioners had a cost basis in the property of $ 93,919.65 for the 1983 sale and $ 83,600 for the 1984 sale. Petitioners allege that the sale in 1983 to the Brights did not actually constitute a taxable sale and that the 1984 sale of 7733 Justin Court to the Kanes was the only true sale of the property involving petitioner. Petitioner explained that after the 1983 transfer to the Brights, *129 he continued to be the equitable owner of the property. Petitioner testified that, in 1983, he was having trouble selling the house, so he arranged a sham sale to the Brights in order to secure a mortgage note on the property. He transferred title to the Brights and paid them $ 1,000. In exchange, petitioner received the proceeds of the mortgage note, less the closing costs. Petitioner stated that he and the Brights inflated the purchase price to $ 104,500 so that the Brights could obtain a mortgage of $ 83,600. Petitioner testified that after the transfer to the Brights, he made payments on the mortgage note and paid the utility expenses associated with the house. Petitioner stated that the Brights never lived in the house. Petitioners argue that they received $ 90,000 on the 1984 sale and had a cost basis of $ 93,919.65; thus, they incurred a loss of $ 3,919.65 on the sale of 7733 Justin Court. We accept petitioner's explanation of the sham sale in 1983 and reject respondent's contention that petitioners had two reportable sales involving 7733 Justin Court. We hold that the alleged sale of 7733 Justin Court to the Brights in 1983 was not a taxable event for petitioners. *130 6095 72d Avenue
Respondent determined that, in 1983, petitioner sold property located at 6095 72d Avenue North for $ 60,000 and had a cost basis of $ 60,536.20. Petitioners did not report the sale of 6095 72d Avenue on their 1983 return. Petitioners do not dispute respondent's determination regarding the gross receipts from the property, but claim that respondent has miscalculated their cost basis. Petitioner testified that he paid $ 7,500 for the lot, that it cost him about $ 3,000 to prepare the lot for construction, and that he built a 2,400- to 2,600-square-foot duplex on the lot at a cost of $ 28 per square foot. Based on petitioner's relatively detailed testimony regarding this property, we hold that petitioners had a total cost basis of $ 77,700 ($ 7,500 cost of unimproved lot + $ 3,000 cost to prepare lot for construction + $ 67,200 cost to construct a 2,400-square foot duplex at $ 28 per square foot). 1984
7806 Ashford Court
In 1984, petitioner sold property located at 7806 Ashford Court to Lawrence J. Renda, Joseph Renda, and Donald Donahue for $ 100,000. Respondent determined that petitioners received $ 100,000 in gross receipts from the sale and *131 had a cost basis of $ 78,750. Petitioners contend that they never received the full $ 100,000 contract price. Petitioner testified that he believed he received only $ 85,000, but was not sure. We find that petitioners have failed to demonstrate that respondent's determinations with regard to 7806 Ashford Court are incorrect. 7733 Justin Court
As discussed above with regard to 1983, petitioners acknowledged receiving $ 90,000 in gross receipts from the sale of 7733 Justin Court in 1984. Petitioners contend that they should be credited with a cost basis of $ 93,919 in the property, which is the basis respondent determined for the 1983 sham sale to the Brights, and not $ 83,600, which is the amount respondent determined for the 1984 sale to the Kanes. Since the $ 83,600 amount is based on the mortgage note the Brights received in 1983 and we have determined that the alleged sale to the Brights was not a taxable transaction, we find that petitioners' cost basis in 7733 Justin Court was $ 93,919. 1985
Lot 15, Shore Acres
In 1985, petitioner sold lot 15, block 25, Shore Acres Overlook Section, located at 4650 Helena, Pinellas County, Florida, to Ronald S. Eliser *132 and Linda S. Eliser (the Elisers). The sale was not reported on petitioners' 1985 return. Petitioner acquired lot 15, Shore Acres on March 19, 1985, from Skipper as part of an exchange of 250 shares petitioner owned in a corporation with Skipper and Klingel. The parties stipulated that petitioners' basis in lot 15, Shore Acres is $ 50,000. Respondent determined, and petitioners agree, that petitioners received $ 42,500 on the sale of the property to the Elisers, resulting in a net loss of $ 7,500. Issue 2. Schedule C Construction Expenses
For 1979, petitioners claimed Schedule C construction expenses as follows: Item Expense
Car and truck expenses
$ 4,819.82
Insurance
1,606.00
Legal and professional services
1,200.00
Telephone
527.00
Subcontractor expenses
10,827.00
Total
18,979.82
For 1979, respondent disallowed the amounts claimed in full. However, respondent allowed $ 813.23 for taxes and $ 194.24 for a mowing expense related to the sale of 10113 Paradise Boulevard. For 1981, petitioners claimed Schedule C construction expenses as follows: Item Expense
Car and truck expenses
$ 1,850.32
Insurance
1,239.52
Interest expense
34,923.14
Legal and professional services
2,400.00
Utilities and telephone
7,702.36
Subcontractor expenses
42,995.06
Total
91,110.40
*133 For 1981, respondent allowed a total of $ 4,844.79 for taxes related to 13160 87th Street North, a restaurant and lounge called the Deck, and 10109 Paradise Boulevard. In addition, respondent allowed the interest expense of $ 34,923.14 as an itemized deduction, since petitioners could not demonstrate that the interest expenses claimed were Schedule C expenses. For 1982, petitioners claimed Schedule C construction expenses as follows: Item Expense
Car and truck expenses
$ 2,200.00
Insurance
1,798.00
Interest expense
23,968.47
Legal and professional services
700.00
Utilities and telephone
7,702.36
Total
36,368.83
For 1982, respondent allowed deductions totaling $ 541.57 for taxes related to 13195 86th Avenue North and lots 1 and 24, Marini and Salvatore Subdivision. In addition, respondent allowed $ 23,968.47 as an itemized deduction, since petitioners could not demonstrate that the interest expenses claimed were Schedule C expenses. Pursuant to section 162(a), a taxpayer may deduct all ordinary and necessary business expenses paid or incurred during the taxable year. However, a taxpayer bears the burden of proving that he is entitled to any deductions claimed *134 on his return. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers are required to maintain records that are sufficient to substantiate claimed deductions. Sec. 6001. We suspect that petitioner probably did incur some expenses related to his construction business; however, petitioners have provided no documentary evidence whatsoever of these expenses. We would willingly apply the Cohan rule, but "there [must] be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose." Williams v. United States, 245 F.2d at 560. Self-serving, vague, and undocumented evidence is insufficient. Williams v. Commissioner, T.C. Memo. 1994-63. Respondent contends that petitioners have not put forward any credible evidence regarding the disallowed Schedule C construction expenses for 1979, 1981, and 1982. At trial, petitioner testified that he incurred all of the listed expenses, and that generally his expenses were much higher than what was claimed on petitioners' returns. He stated *135 that Welsh was responsible for calculating the expenses. With respect to car and truck expenses, petitioner testified that the construction business had a van, two pickup trucks, and a station wagon. Petitioner also testified that in 1979, one of the trucks needed a new motor. Consequently, for 1979, we find that $ 2,000 of petitioners' 1979 reported car and truck expenses is deductible; the remaining $ 2,819.82 is disallowed. For 1981 and 1982, we find that $ 1,500 is deductible in each year; the remaining $ 350.22 and $ 700, respectively, is disallowed. With respect to expenses for insurance, subcontractors, utilities and telephone, and legal and professional services, petitioner's testimony was vague and failed to provide any basis whatsoever for estimation or approximation. Under these circumstances, it cannot be said that petitioners have carried their burden of proof. Accordingly, we sustain respondent's determinations for 1979, 1981, and 1982 regarding petitioners' Schedules C expenses for insurance, subcontractors, utilities and telephone, and legal and professional services. Issue 3. Rental Income
During the years in issue, petitioners owned several houses *136 and businesses that produced rental income. For 1979, 1980, 1981, 1982, 1984, and 1985, respondent determined that petitioners received rental income that they failed to report, as follows: Year and Amount
1979
1980
1981
Total rental income
$ 51,409.07
$ 93,367.50
$ 110.237.60
Less rental income reported
18,936.57
19,380.00
20,983.60
Unreported rental income
32,472.50
73,987.50
89,254.00
1982
1984
1985
Total rental income
$ 136,902.91
$ 128,978.00
$ 81,168.00
Less rental income reported
72,000.00
90,291.00
42,481.00
Unreported rental income
64,902.91
38,687.00
38,687.00
The Jungle Prada
In 1979, petitioner purchased the Jungle Prada Apartments (the Jungle Prada), which consisted of a complex of approximately 31 apartments and a restaurant known first as Chef Lazars and later as the Kyoto Inn. In 1979, 1980, 1981, 1982, 1984, and 1985 petitioners reported rental income from the Jungle Prada as follows: Year
Amount 1979
$ 18,936.57
1980
19,380.00
1981
20,983.60
1982
72,000.00
1984
90,291.00
1985
42,481.00
Respondent contends that petitioners actually received rental income from the Jungle Prada as follows: Year
Amount
1979
$ 34,862.43
1980
93,367.50
1981
78,272.50
1982
94,716.11
*137 Respondent does not dispute the amounts of rental income petitioners reported from the Jungle Prada for 1984 and 1985. Petitioners argue that respondent's determinations of the amounts of rental income collected from tenants of the Jungle Prada are incorrect. Petitioner testified that respondent's numbers are unreasonably high, but acknowledged that some of the numbers reported on petitioners' returns probably were not correct either. Petitioner explained that the tenants, including the restaurant, were unreliable, generally rented from month to month, and frequently did not pay their rent. Petitioner testified that rents for the apartments ranged from $ 112 to $ 250, and that his father and mother, who managed the Jungle Prada, kept rental receipts. Petitioners did not produce any documentation for the Jungle Prada or any other rental property for any of the years in issue. Petitioner offered no testimony regarding the amounts of rent that went unpaid or the occupancy rate for the apartments. Petitioner's testimony was generally very vague and did little to demonstrate that respondent had erred in calculating the amounts of rental income received. Accordingly, we sustain *138 respondent's determinations of income received from the Jungle Prada. Rental Properties Sold in 1979
In 1979, petitioners rented several houses that they sold to Roger B. Broderick (Broderick) in June 1979. Respondent determined that petitioners earned $ 16,546.64 in rental income from these properties, which they failed to report on their 1979 return. Petitioners did not present any argument on this issue; accordingly, respondent's determination is sustained. The Trap
In 1981, petitioner purchased a restaurant and lounge known as the Trap in Pinellas Park, Florida, from Curtis F. Gau and Janice M. Gau (the Gaus) for a contract price of $ 400,000. As part of the purchase, petitioner acquired the land, building, equipment, and liquor license for the business. Petitioner formed a Florida corporation, Lounge Enterprises, to operate the Trap, but did not transfer any of the business' assets to Lounge Enterprises. Petitioner made a downpayment of approximately $ 100,000 and gave the Gaus a note for $ 300,000 secured by a purchase money mortgage. From 1981 to approximately 1987, petitioner directed Greene, the manager of the Trap, to make payments on the mortgage note, *139 for which petitioner personally was liable, from the corporate receipts of Lounge Enterprises. Respondent determined that, in 1981, 1982, 1983, and 1984, petitioners received rental income of $ 29,015.10, $ 38,686.80, $ 38,687, and $ 38,687, respectively, from the Trap. Respondent determined these amounts based on the Trap's fair rental value. Respondent contends that by paying his personal obligations out of corporate receipts, petitioner was diverting corporate funds and, effectively, paying himself rent for Lounge Enterprises' use of the Trap. Petitioners never reported any rental income from the Trap. Petitioners argue that petitioner did not consider the amounts paid by Lounge Enterprises to the Gaus to be rent and that he had no rental agreement with Lounge Enterprises; thus, it is inappropriate to attribute rental income to them. We disagree. Petitioners received a benefit from having Lounge Enterprises make payments on a mortgage note for which petitioner, not the corporation, was liable. This benefit should be taxed in some manner, either as rental income or as constructive dividend income. Petitioners presented no persuasive evidence to refute respondent's determinations *140 of the fair rental value of the Trap. Nor did they show that the rental income exceeded the payments on the mortgage note. Accordingly, respondent's determinations regarding rental income received by petitioners from Lounge Enterprises are sustained. 13196 87th Avenue
In 1981, petitioner built a house at 13196 87th Avenue North in Seminole, Florida, which was leased to John and Evelyn Clement (the Clements). Respondent determined that, in 1981 and 1982, petitioners received $ 2,950 and $ 3,500, respectively, from the rental of the house at 13196 87th Avenue, which petitioners failed to report on their 1981 and 1982 returns. [2] The parties stipulated a document which reflects that petitioners received those amounts from the Clements. Accordingly, respondent's determinations with respect to rental income received from 13196 87th Avenue are sustained. *141 Issue 4. Rental Property Expenses and Depreciation
During the years in issue, petitioners claimed rental property expenses and depreciation as follows: Year
Amount
Expenses
Depreciation
1979
$  19,764.68
$ 12,708.33
1980
9,597.00
11,250.00
1981
21,478.61
12,708.33
1982
56,835.00
12,708.33
1983
38,022.00
16,222.00
1984
65,344.00
34,200.00
1985
136,380.00
48,047.00
Respondent determined that petitioners are entitled to rental property expenses and depreciation for the rental properties sold in 1979, 13196 87th Avenue, the Jungle Prada, and the Trap as follows: [3]
Year
Amount
Expenses
Depreciation
1979
$     866.08
$  5,030.45
1980
4,034.00
7,865.00
1981
71,780.80
22,352.44
1982
90,646.40
28,090.97
1983
30,908.00
11,379.00
1984
51,756.00
35,248.00
1985
126,515.00
53,284.00
*142 Petitioners presented no evidence regarding their rental expenses and depreciation deductions. On brief, petitioners concede that they are unable to substantiate any expenses that respondent has disallowed, but argue that in certain cases respondent has been too aggressive. Petitioners note particularly respondent's disallowance of all rental expense deductions for the Jungle Prada in 1979. Petitioners argue that it would have been impossible for them to earn $ 34,862.43 in rental income in 1979, as determined by respondent, without incurring any expenses related to the production of that income. While we agree with petitioners that respondent's disallowance of all rental expenses for 1979 seems odd given the amount of rental income they apparently earned, petitioners have failed to provide any evidence establishing their entitlement to the claimed expenses. Furthermore, petitioners have not provided any testimony or other evidence that would serve as a basis for estimating their rental expenses. Under these circumstances, we have no choice but to hold that petitioners have not met their burden of proof. We sustain respondent's determinations regarding petitioners' rental *143 expense and depreciation deductions. Issue 5. Bagel King Depreciation Deduction
In 1983, petitioner owned a business called the Bagel King, which he leased to someone with experience in bagel production. On their 1983 return, petitioners claimed a depreciation deduction of $ 7,551 for the Bagel King. Respondent determined that petitioners are not entitled to the claimed depreciation deduction because the Bagel King had no qualified recovery property at the end of the year. Petitioners presented no evidence on this issue and do not discuss it on brief. Accordingly, we hold that respondent's disallowance of a depreciation deduction for the Bagel King is sustained. Issue 6. Capital Gain Income
1979
For 1979, respondent determined that petitioners sold 11 properties and received a total of $ 35,515.92 in capital gains. Petitioners reported capital gains of $ 5,136.18 on their 1979 income tax return. Petitioners presented no testimony or other evidence and made no argument on brief regarding three of the properties sold in 1979: 8030 47th Avenue North, 8528 92d Terrace North, and 6407 67th Avenue North. Consequently, we hold that respondent's determinations *144 regarding the capital gains attributable to the sales of these properties are sustained. Rental Properties Sold to Roger B. Broderick
In 1979, petitioner sold seven houses to Broderick for a contract price of $ 182,544.94. Although none of the properties were held in petitioner's name, petitioner told Broderick that he owned all of the properties. Broderick gave petitioner a deposit of $ 5,000, paid him $ 1,100 for settlement costs at the closing, assumed the existing mortgage notes on the properties, and gave petitioner a personal note for $ 70,000. Respondent determined that petitioners realized $ 182,544.94 on the sale and had a total adjusted basis in the properties of $ 20,732.10. Section 1001(a) provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis. The adjusted basis for determining the gain from the sale of property is the basis prescribed by section 1012 adjusted as provided in section 1016. Sec. 1011(a). The basis of property is, in general, the cost of the property. Sec. 1012. An adjustment to basis is made for the cost of improvements made to the property. Sec. 1016(a)(1); sec. 1.1016-2(a), *145 Income Tax Regs.
Petitioners contend that respondent has overstated the amount realized from the sale because Broderick did not pay the full contract price in 1979. Petitioners have failed to demonstrate that the note petitioner received from Broderick had a fair market value that was less than its face value. Accordingly, respondent's determination is sustained. 6407 67th Avenue
In 1979, property titled in the names of Chris E. Reynolds and Beverly Reynolds (the Reynolds) located at 6407 67th Avenue North, Pinellas Park, Florida, was sold to Mike Michaels for $ 42,500. The parties stipulated that the Reynolds held this property as nominees of petitioner. Respondent determined that petitioners realized $ 42,500 on the sale of the property to Mike Michaels and had an adjusted basis of $ 24,054.75. Petitioners contend that they did not receive the full proceeds of the sale at the time of closing, and that they applied the proceeds to improvements to the Jungle Prada. Nevertheless, petitioners have not produced any evidence to support their claims and have failed to demonstrate that they did not receive a capital gain of $ 18,445.25 from the sale of the property at 6407 *146 67th Avenue in 1979. Respondent's determination is sustained. Crown Anchor Inn or Captain Bill's Seafood Kitchen
In 1977, petitioner purchased a restaurant and lounge called Captain Bill's Seafood Kitchen, also known as the Crown Anchor Inn, for $ 33,500. In 1978, petitioner hired Jim Seavers (Seavers) to run the business and, in mid-1978, entered into a lease/purchase agreement with Seavers. The agreement provided that Seavers would purchase the property for $ 50,000, making payments of $ 250 per week with no interest. Seavers made payments sporadically until mid-1980, at which time petitioner repossessed the property and the business. On November 4, 1980, petitioner entered into a contract to sell the real property and business to Nancy and Jack Phelps (the Phelps) for $ 25,000. The Phelps agreed to provide a downpayment of $ 5,500, with payments of $ 531.18 per month at 10 percent interest. The Phelps made payments until 1983, at which point petitioner took $ 5,000 in satisfaction of the note. Respondent determined that petitioners realized long-term capital gains of $ 4,290 in 1979 and $ 1,980 in 1980 from the payments by Seavers to petitioner, and a gain of $ 8,250 *147 on petitioner's repossession of the property and business in 1980. Respondent's computation of the capital gain on repossession is as follows: Fair market value on repossession
$ 25,000
Basis of buyer's obligation:
Selling price
$ 50,000
Less assumed payments of obligation
at time of repossession
25,000
Less unrealized profit [4]
8,250
Total
16,750
Gain on repossession
8,250
Respondent calculated the "assumed payments of obligation at time of repossession", or the total amount petitioners received from Seavers, based on the assumption that *148 Seavers made every installment payment for 24 weeks in 1978, 52 weeks in 1979, and 24 weeks in 1980: Year
Payments Received
Total
1978
24 weeks X $ 250
$  6,000
1979
52 weeks X $ 250
13,000
1980
24 weeks X $ 250
6,000
25,000
Section 1038 provides that if a sale of real property gives rise to a debt secured by the property sold, and the seller repossesses the property in satisfaction of the debt, no gain will result except to the extent that the amount of the payments received prior to the reacquisition exceeds the amount of income reported by the seller prior to the reacquisition. Conners v. Commissioner, 88 T.C. 541, 547 (1987). Such gain on repossession shall not exceed the amount by which the price at which the property was sold exceeded its adjusted basis. Sec. 1038(b)(2). Petitioners do not contest respondent's determination that petitioners had taxable capital gains of $ 4,290 in 1979 and $ 1,980 in 1980. Petitioners argue, however, that respondent's calculation of the gain on repossession of the Crown Anchor Inn in 1980 is incorrect. Petitioners contend that respondent's assumption that petitioner received every installment *149 payment of $ 250 between the sale date and the date of repossession is illogical. Petitioner testified that Seavers paid him "off and on for 6 or 7 months." Respondent counters that petitioner's testimony is uncorroborated and that it is perfectly reasonable to assume that Seavers made the payments from the date of sale in 1978 until the date of repossession because petitioner would likely repossess if only one payment was missed. We are inclined to agree, at least partly, with petitioners on this issue. Although petitioners presented no evidence to support the claim that petitioner received payments for only 6 or 7 months, we note that the parties stipulated that Seavers made the payments "sporadically" until mid-1980. It seems illogical for respondent to base the calculations of gain on the assumption that every payment was made until mid-1980 having stipulated something different. We find that petitioners have demonstrated that respondent's determination is erroneous; however, we do not find petitioner's rather vague testimony about receiving payments off and on for 6 or 7 months to be particularly helpful in ascertaining the number of payments petitioner received from Seavers. *150 In view of the parties' stipulation regarding payments made by Seavers, we believe it is reasonable to assume that petitioners received half of the payments owed them between mid-1978 and mid-1980. Accordingly, we hold that petitioners' gains for 1979, 1980, and on repossession should be recalculated under Rule 155 based on the assumption that petitioner received 12 payments in 1978, 26 payments in 1979, and 12 payments in 1980. 1980
For 1980, respondent determined that petitioners sold four properties and received a total of $ 149,542.33 in capital gains. Petitioners reported no capital gains on their 1980 income tax return. Security Acres
Petitioners presented no testimony or other evidence and made no argument on brief regarding one of the four properties sold in 1980, lots 19 and 20, Security Acres. Consequently, we hold that respondent's determination regarding the capital gain received from the sale of this property is sustained. 6071 67th Avenue
In 1980, petitioner sold lot 34, Debra Heights, located at 6071 67th Avenue North, to Kenneth J. LaPerna. Respondent determined that petitioners realized $ 33,357.89, after selling costs, on the sale of 6071 *151 67th Avenue to Kenneth J. LaPerna and had an adjusted basis of $ 15,412.09. Petitioners contend that they did not receive the full proceeds of the sale at the time of closing. Petitioners have not produced any evidence, however, to demonstrate that they did not receive $ 33,357.89 from the sale 6071 67th Avenue as determined by respondent. Petitioners also contend that their basis in the property should be increased because petitioner spent at least $ 12,000 in improvements to the property, including installing a new roof and air conditioning. Nevertheless, petitioners made no independent determination of their basis in the property and are simply asking that we increase respondent's determination of adjusted basis by at least $ 12,000 in the absence of any evidence to support petitioner's fairly vague testimony. Under these circumstances, petitioners have not met their burden of proof, and we sustain respondent's determination. 7002 62d Avenue
Respondent determined that, in 1980, petitioner sold property located at 7002 62d Avenue North, St. Petersburg, Florida, to Frank J. Guida and Bernice L. Guida (the Guidas) for a contract price of $ 59,900. Respondent determined *152 that petitioners realized $ 50,384.97, after expenses of the sale, and had an adjusted basis in the property of $ 39,685.13. Petitioners state that petitioner transferred title to the Guidas, but claim that no taxable sale actually took place. At trial, petitioner explained that he paid the Guidas $ 1,000 to participate in a sham sale in order to secure a mortgage note on the property. Petitioner received the proceeds of the mortgage, made all payments on the mortgage note, and paid all taxes and upkeep costs after the transfer. Petitioner testified that he received the proceeds of the sale the next time the house was sold. Petitioner's parents lived in the house after the alleged sale to the Guidas. Frank J. Guida's testimony supported petitioner's version of events. We accept petitioner's explanation of the transfer to the Guidas in 1980 and hold that it did not constitute a taxable sale. The Deck
In 1976 or 1977, Quality Home Builders purchased a restaurant and lounge called the Deck. In 1980, the Deck, which was still titled in the name of Quality Home Builders, was sold to Nett Development Corp., a condominium developer. Quality Home Builders distributed the sales *153 proceeds to petitioner. On brief, petitioners concede respondent's determination of capital gain received from the sale of the Deck in 1980. 1981
For 1981, respondent determined that petitioners sold five properties: lots 3, 4, and 5 Sigsbee Subdivision, 735 116th Avenue Treasure Island, and Unit 411-B Treasure Island Yacht Club. Respondent determined that petitioners received a total of $ 44,121.41 in short-term and long-term capital gains from the sales of these properties. Petitioners reported no capital gains on their 1981 income tax return. Petitioners presented no testimony or other evidence and made no argument on brief regarding any of the five properties except to state that it was the fault of their accountant, Welsh, that the sales of the properties were not reported. We hold that respondent's determinations regarding the capital gains received from the sales of these properties are sustained. 1983
For 1983, respondent determined that petitioners had nine property sales transactions that generated a total of $ 149,583 in short-term and long-term capital gains: (1) Sale of lots 43 and 45, block 26, Avon Dale; (2) sale of lot 10, block 11, First Section, *154 Lellman Heights, lot 5, W 1/2 lot 4, block 8, Glass Subdivision; (3) sale of Unit 606, Treasure Island Tennis and Yacht Club; (4) sale of lots 52 and 53, block 1, Yacht Club Addition to South Causeway Isle; (5) sale of lot 21, block 2, Holiday Park, Seventh Addition; (6) sale of lot 3, block 1, Pasadena Vista; (7) sale of lot 51, First Addition, Paradise Island; (8) sale of Tract BC, Myron A. Smith's Bay View; and (9) sale of a house to David Bright. Petitioners reported net capital gains of $ 12,930 on their 1983 income tax return. Petitioners presented no testimony or other evidence and made no argument on brief regarding any of the nine transactions except to state that it is inconceivable that they earned profits as respondent alleges. Petitioners have not met their burden of proof, and accordingly respondent's determinations are sustained. 1984
For 1984, respondent determined that petitioners sold five properties, receiving a total of $ 76,826 in short-term and long-term capital gains. Petitioners reported total capital gains of $ 47,902 on their 1984 income tax return. Petitioners have not challenged respondent's determinations with respect to four of the five properties: *155 (1) 4200 Carson Street; (2) Apartment #112, Treasure Island Tennis & Yacht Club; (3) the Beach Bar; and (4) Executive Motor Lodge. Accordingly, we hold that respondent's determinations regarding the capital gains and losses from the sales of these four properties are sustained. 7810 10th Avenue
The remaining property sold by petitioners in 1984 is located at 7810 10th Avenue South (lot 24, block 4, Yacht Club Second Addition to South Causeway Isle). Petitioners sold the property to Mark R. Lewis and Sharon R. Lewis (the Lewises). The closing statement for the transaction states that the purchase price was $ 175,000. As part of purchase, the Lewises transferred two properties to petitioner: Unit 20 at the Treasures of Capri (a condominium), and a house at 4200 Carson Street. Petitioner assumed the mortgage notes on both of the trade properties, and gave the Lewises credit of $ 25,000 for the equity that they had in the two trade properties. The Lewises also gave petitioner a note for $ 15,904.29. Petitioners reported the sale of 7810 10th Avenue on their 1984 return, claiming that they had a short-term capital loss of $ 10,000 because they received $ 175,000 and had a *156 basis of $ 185,000. Respondent determined that petitioners had a $ 20,000 short-term capital gain from the sale because petitioners received $ 175,000 and had a basis in the property of $ 155,000. Petitioners contend that respondent has calculated incorrectly their basis in 7810 10th Avenue. Petitioner testified that he originally bought 7810 10th Avenue for $ 155,000, and spent at least $ 15,000 in improvements to the property before selling it to the Lewises. Mark Lewis also testified that petitioner spent at least $ 15,000 on renovating the house, and both testified about the improvements with reasonable specificity. We find that petitioners have demonstrated that they had a basis of $ 170,000 ($ 155,000 + $ 15,000) in 7810 10th Avenue, and thus had a short-term gain of $ 5,000 on the sale of the property. 1985
For 1985, respondent determined that petitioners had a net capital gain of $ 155,468 attributable to the sale of four properties. Petitioners reported a net capital loss of $ 3,000 on their 1985 income tax return. With regard to one of the four properties, condominium #107, Treasure Island, petitioners have not contested respondent's determination. In addition, *157 on Schedule D of their 1985 return, petitioners claimed an $ 83,000 short-term loss for "non-business bad debts: monies advanced to related control corporations that subsequently went out of business". Respondent disallowed these amounts in full, and petitioners have not challenged that disallowance. The parties stipulated that petitioners had long-term capital gain of $ 5,739.55 from the sale or exchange in 1985 of 250 shares in Paradise Island Investment Corporation. Petitioners failed to report this transaction on their 1985 return. Davista Lot
According to various documents which the parties have stipulated, lot 1, block 53, revised map of Davista (the Davista lot) was sold to Beverly I. Moore (Moore) by Carrol H. Dow and Julie B. Dow (the Dows) in 1978. The Dows accepted a note for $ 11,500 from Moore secured by a purchase money mortgage. On July 18, 1984, Moore sold the Davista lot to the Reynolds, petitioners' daughter and son-in-law, subject to the Dows' purchase money mortgage. On February 6, 1985, the Reynolds executed a quitclaim deed transferring the Davista lot to petitioner. The parties stipulated that the Reynolds had no interest in the property and held *158 it as nominees of petitioner. Finally, on February 14, 1985, petitioner sold the Davista lot to Neil F. O'Connor. Petitioners reported a short-term capital gain of $ 8,000 from this transaction on their 1985 return, claiming that they received $ 36,000 for the lot and had a basis of $ 28,000. Respondent determined that petitioners sold the property for $ 37,000 and had a zero basis. Petitioner testified at trial that he had bought the Davista lot from Moore for $ 28,000. Respondent states correctly that there is nothing in the record to substantiate petitioners' claim regarding their basis. Nevertheless, the parties have stipulated that the Reynolds held the Davista lot as nominees of petitioner, so we accept petitioner's testimony that he, rather than the Reynolds, bought the property from Moore in 1984. The documents recording the 1984 transfer, to which the parties stipulated, do not indicate that Moore gave the property to the Reynolds for no consideration. Therefore, we see no reason to disregard petitioner's testimony that petitioners had a basis in the Davista lot of $ 28,000. We find that petitioners had a long-term capital gain of $ 8,000 from the sale of the Davista *159 lot in 1985. 7002 62d Avenue
This property was discussed previously in this section (Issue 6) with regard to 1980. The parties stipulated that this property was originally sold by petitioner to the Guidas on January 18, 1980. The parties also stipulated a deed reflecting a sale of the property by the Guidas to Greene on October 1, 1980. [5] On or about May 5, 1985, Greene executed a quitclaim deed to the property in favor of petitioner. Finally, on May 6, 1985, petitioner sold 7002 62d Avenue to James E. Cochran (Cochran). Respondent determined that petitioners realized a short-term capital gain of $ 71,000 in 1985 from the sale to Cochran. Respondent also determined that petitioners had a zero basis *160 in the property at the time of the sale to Cochran because they failed to establish that they provided any consideration for the transfer from Greene to petitioner. Petitioners claim that the only true sale of 7002 62d Avenue was that by petitioner to Cochran on May 6, 1985, and that petitioner was the sole equitable owner of the property prior to that time. On Schedule D of their 1985 return, petitioners reported a gross sale price of $ 72,500 and a basis of $ 68,000. Since petitioners have not presented any evidence to support petitioner's rather vague testimony regarding the costs of constructing a house on the lot at 7002 62d Avenue, we accept as the correct basis the amount determined by respondent with respect to the sale of this property to the Guidas in 1980, $ 39,685.13. Petitioners have failed to show that they received the full $ 72,500 from the sale of 7002 62d Avenue. Therefore, we use the $ 71,000 sale price determined by respondent to calculate petitioners' gain. Accordingly, we hold that petitioners had a long-term capital gain of $ 31,314.87 ($ 71,000 - $ 39,685.13) on the sale of 7002 62d Avenue in 1985. Lot 3, Block 1, Marini and Salvatore Subdivision
*161 On August 19, 1985, petitioner sold lot 3, block 1, Marini and Salvatore Subdivision, to Horizon Home Builders, Inc. Petitioners reported a $ 1,000 long-term capital gain from the sale on their 1985 return, claiming they received $ 10,000 for the lot and had a basis of $ 9,000. Respondent determined that petitioners received $ 9,500 on the sale, and the parties stipulated that petitioners had a $ 10,000 basis in the property, resulting in a $ 500 capital loss. We so hold. Issue 7. Forgiveness of Indebtedness Income
In 1979, petitioner purchased the Jungle Prada from Charles E. George and Nina George (the Georges) for $ 481,250. Pursuant to this purchase, petitioner executed a note in the amount of $ 151,250 secured by a purchase money mortgage. Petitioner also assumed a mortgage with Flagship Bank in the amount of $ 274,299.26. In August 1980, petitioner negotiated a $ 47,250 purchase price reduction with the Georges. Respondent determined that petitioners had income from forgiveness of indebtedness in the amount of $ 47,250 in 1980. Gross income includes income from the discharge of indebtedness. Sec. 61(a)(12). Petitioners argue that they may exclude the $ 47,250 *162 from income on the grounds that they qualify for a purchase-money debt reduction under section 108(e)(5). Section 108(e)(5) provides: SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS. * * * (e) General Rules for Discharge of Indebtedness (Including Discharges Not in Title 11 Cases of Insolvency). -- For purposes of this title -- * * * (5) Purchase-money debt reduction for solvent debtor treated as price reduction. -- If -- (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced. (B) such reduction does not occur -- (i) in a title 11 case, or (ii) when the purchaser is insolvent, and (C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,
then such reduction shall be treated as a purchase price adjustment.
The parties stipulated that the debt reduced was that owed to the Georges, who were the sellers of the property. There is no evidence that petitioners were insolvent at the time of the reduction, or that the reduction occurred in the context of a title 11 case. Consequently, this transaction falls within the parameters *163 of section 108(e)(5), and petitioners do not have discharge of indebtedness income. Issue 8. Unreported Income From Lounge Enterprises and Executive Motor Lodge
In 1980, petitioner formed a corporation, Executive Motor Lodge, that purchased a property consisting of a motel and a restaurant and lounge called the Office Lounge. Greene managed the Office Lounge. In August 1981, Greene and petitioner entered into a management contract for the Executive Motor Lodge that provided Greene with an option to purchase the corporation. The contract was executed by Greene and petitioner as "the Owner" of Executive Motor Lodge. The contract provided that Greene would pay petitioner monthly installments of $ 5,000 as a downpayment on Executive Motor Lodge. On July 12, 1984, Greene purchased "All personalty, tangible or intangible, customarily used in the operation of the Executive Motor Lodge and/or Office Lounge" from Executive Motor Lodge. The other corporation involved in this issue is Lounge Enterprises, which was discussed with respect to Issue 3, supra. As part of his purchase of the Trap, petitioner acquired the land, building, equipment, and liquor license for the business. *164 Petitioner formed Lounge Enterprises, to operate the Trap, but did not transfer any of the business' assets to Lounge Enterprises. Petitioner made a downpayment of approximately $ 100,000 and gave the Gaus a note for $ 300,000 secured by a purchase money mortgage. From 1981 to 1987, petitioner directed Greene, the manager of the Trap, to make payments on the mortgage note, for which petitioner was liable, from the corporate receipts of Lounge Enterprises. Petitioner was the sole shareholder of both Executive Motor Lodge and Lounge Enterprises during the years relevant to this issue. Respondent alleges that, beginning in 1981 and continuing through 1984, petitioner directed Greene to distribute corporate funds to him for his personal use. In the statutory notice of deficiency for docket No. 8884-90, respondent determined that petitioners failed to report income from Lounge Enterprises in the amounts of $ 46,738.03 for 1981 and $ 80,998.37 for 1982. Respondent also determined that petitioners failed to report income from Executive Motor Lodge in the amounts of $ 48,600 for 1981, $ 71,300 for 1982, and $ 30,000 for 1984. Sometime after the issuance of the statutory notices of *165 deficiency and the filing of the petitions, respondent discovered a logbook maintained by Greene that respondent alleges establishes substantial additional unreported distributions received by petitioners from Lounge Enterprises and Executive Motor Lodge. Accordingly, respondent asserts that petitioners are liable for increased deficiencies for 1981, 1982, 1983, and 1985. In the amendments to answer and on brief, respondent alleges that, at a minimum, petitioners failed to report income from diverted corporate receipts of $ 101,237.36 for 1981, $ 170,484.04 for 1982, $ 98,146.56 for 1983, and $ 32,800 for 1984, which are the amounts reported in Greene's logbook. According to charts respondent provided with the amendments to answer, there are a few distributions that respondent included in the notices of deficiency that were not reflected in Greene's logbook. Petitioners have the burden of proof with respect to the constructive dividends determined in the statutory notice of deficiency for docket No. 8884-90. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent has the burden of proof with respect to the increased deficiencies asserted *166 in the amendments to answer. Rule 142(a). Section 61(a) defines gross income as all income from whatever source derived, including dividends. Sec. 61(a)(7). Under sections 301(a) and (c)(1) and 316 a distribution of property made by a corporation to a stockholder generally is includable in the stockholder's gross income as a dividend to the extent of the corporation's earnings and profits. A distribution under section 301 may be found even though the corporation has not formally declared a dividend. Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974). The test for constructive dividends is twofold: not only must the distributions be nondeductible to the corporation, but they also must represent some economic gain or benefit to the stockholder. Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977), remanding T.C. Memo. 1973-223. Thus, where a corporation makes a distribution to a shareholder which serves no legitimate corporate purpose *167 and which results in an economic benefit to the shareholder, such benefit constitutes a constructive dividend to the extent of earnings and profits. Falsetti v. Commissioner, 85 T.C. 332, 357 (1985). The parties agree that for the years 1981, 1982, 1983, and 1984, Greene kept a logbook of all cash distributions of corporate receipts from Executive Motor Lodge and Lounge Enterprises. For each distribution, Greene required the recipient, petitioner, or someone on his behalf to sign the logbook. Petitioners do not dispute that petitioner received all of the distributions recorded. With respect to Lounge Enterprises, Greene testified that, in addition to the mortgage note payments which petitioner paid from corporate receipts (see supra Issue 3), petitioner also received monthly cash payments of $ 4,848.67 and weekly payments of $ 1,400 as salary from corporate receipts. Greene stated that other than occasional discussions about the business, petitioner did not perform any services for the salary he received. With respect to Executive Motor Lodge, petitioner received monthly cash payments of $ 5,000 from corporate receipts. According to Greene, *168 petitioner told her that he was entitled to receive these payments so that he could recoup his downpayment on the business. Greene stated that initially petitioner's $ 5,000 payments were made by check, but then at petitioner's and Welsh's suggestion, she made all remaining payments in cash. Greene testified that, after being audited by the IRS, $ 150,000 of the $ 5,000 monthly payments was characterized as income to her from Executive Motor Lodge, and was treated as her downpayment on the business. There are no documents in the record explaining this recharacterization, and Greene's testimony failed to clarify whether petitioner or Executive Motor Lodge was considered the recipient of the downpayment. On brief, petitioners assert that they cannot be charged with receiving income in the form of diverted corporate receipts from the Executive Motor Lodge, because respondent has characterized those amounts as a downpayment by Greene. Nevertheless, petitioners have failed to demonstrate why the simple fact that Greene ultimately paid tax on the $ 150,000 is relevant to ascertaining petitioners' tax liabilities. In addition, petitioners have failed to prove that petitioner did not *169 receive $ 150,000 in taxable cash distributions from Executive Motor Lodge. With respect to Lounge Enterprises, petitioners allege that by charging them with rental income for Lounge Enterprises' payment of petitioner's mortgage note on the Trap (see supra Issue 3) and with dividend income from the cash distributions made by Lounge Enterprises, to petitioner, respondent is attempting to tax petitioners twice on the same diverted funds. This argument is meritless. Greene's testimony was clear that, at petitioner's instruction, she made monthly payments by check to the Gaus for the mortgage note for which petitioner was personally liable, and she made monthly distributions in cash to petitioner, which he considered to be a return of his original investment. Respondent determined that petitioners had unreported rental income from the payments made by Lounge Enterprises for petitioner's mortgage note, and determined that petitioners had unreported dividend income from the cash distributions. Both determinations seem appropriate, and we can find no evidence for petitioners' proposition that respondent is attempting to tax petitioners twice on only one amount of diverted funds. *170 Petitioners did not produce any corporate books and records or any other documentary evidence regarding the nature and purpose of the distributions made from corporate receipts. Petitioners have failed to prove that the distributions determined by respondent in the statutory notice of deficiency for docket No. 8884-90 served any bona fide corporate purpose, and that the distributions did not represent some economic gain or benefit to petitioners. Generally, any corporate distribution of property made by a corporation to its shareholders with respect to their stock is considered a dividend to the extent such distribution is out of earnings and profits of the corporation. Sec. 316(a). That portion of such a corporate distribution which is not a dividend is treated as gain from the sale or exchange of property to the extent the fair market value of the distribution exceeds the shareholder's adjusted basis in his stock. Sec. 301(c)(3). The only evidence presented by either party with regard to the earnings and profits of Lounge Enterprises and Executive Motor Lodge was the testimony of Greene and her husband, Robert Greene, who was employed as a general manager of the motel, that *171 both corporations were very profitable. We note that despite Robert Greene's initial assertion that both businesses were very profitable, he also stated that at times the businesses were not profitable. We find both Robert and Dianne Greene's testimony too vague to be probative. In the absence of any determinative evidence on this point, we find that petitioners have not proved that any distributions received from the corporations were not out of their earnings and profits and are not taxable as ordinary income under sections 61(a)(7), 301(c)(1), and 316(a). We sustain respondent with respect to the amounts of unreported corporate receipts determined in the statutory notice of deficiency for docket No. 8884-90. With respect to the increased deficiencies asserted in the amended answers, respondent contends that all of the cash payments recorded in Greene's logbook should be considered income to petitioners. Respondent alleges that these distributions served no legitimate corporate purpose, and while we believe respondent is probably correct, respondent, like petitioners, has failed to produce evidence establishing either the earnings and profits of Executive Motor Lodge and Lounge *172 Enterprises, or petitioner's adjusted basis in his stock in either corporation. Accordingly, respondent has failed to meet her burden of proof, and we hold for petitioners on the increased deficiencies attributable to distributions from Lounge Enterprises and Executive Motor Lodge. Issue 9. Itemized Deductions
Petitioners claimed a deduction of $ 1,980 on Schedule A of their 1985 income tax return for medical and dental expenses. Respondent determined that due to the increase in petitioners' gross income, their medical expenses no longer exceed 5 percent of petitioners' adjusted gross income and disallowed the deduction. We hold that, if petitioners' medical expenses do not exceed 5 percent of their gross income for 1985 after recomputation, respondent's determination is sustained. Issue 10. Fraud
Respondent determined that petitioners are liable for fraud additions to tax under section 6653(b) for 1979, 1980, and 1981, and under section 6653(b)(1) and (2) for 1982, 1983, 1984, and 1985. In order to establish petitioners' liability for fraud, respondent bears the burden of proving by clear and convincing evidence that: (1) An underpayment of tax exists for each *173 of the years in issue, and (2) that some portion of each underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 698-699 (1989); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). To meet this burden, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from proven facts because direct proof of a taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra.A taxpayer's entire course of conduct may establish the requisite *174 fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The intent to conceal or mislead may be inferred from a pattern of conduct. Spies v. United States, supra at 499. Petitioners have conceded that they failed to report receipts from several transactions, wages, and interest income. In addition, respondent has established underpayments of tax in all of the years in issue. Thus, respondent has proven by clear and convincing evidence the existence of underpayments of tax in all years in issue. Having proven underpayments of tax, respondent must also prove that some portion of the underpayments was due to fraud. Courts have developed various factors or "badges" which tend to establish fraud. Circumstantial evidence that may give rise to a finding of fraudulent intent includes: (1) Understatement of income; (2) inadequate or no records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) failure to *175 make estimated tax payments; (8) dealing in cash; (9) engaging in illegal activity; and (10) attempting to conceal an illegal activity. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner, 102 T.C. 632 (1994). These "badges" of fraud are nonexclusive. Miller v. Commissioner, 94 T.C. 316, 334 (1990). Respondent cites petitioner's diversion of corporate funds for personal use, use of nominees, failure to report many real estate transactions, consistent understatements of income over a period of years, failure to keep adequate records, and use of cash. In addition, respondent notes that petitioner has admitted to involvement, during the years in issue, in two businesses, Club 401 and Boulevard Texaco, the operations of which were never reported on petitioners' returns. Petitioners' sole argument that their conduct was not intentionally fraudulent is that they claim they honestly believed that their accountant, Welsh, was a competent bookkeeper and tax adviser, and that they relied on his services. Petitioners *176 concede that many items of income were either understated or not reported at all on their returns, but claim that they provided Welsh, and later VanSon, with all of their records and that it is Welsh's fault that petitioner's business transactions were not properly reported. Putting aside the question of whether petitioners can claim reliance on Welsh when he did not sign their returns as preparer, as a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Bailey v. Commissioner, 21 T.C. 678, 687 (1954). It is possible for reasonable reliance on a competent agent to be a sufficient defense to fraud. Davis v. Commissioner, 184 F.2d 86, 88 (10th Cir. 1950), remanding a Memorandum Opinion of this Court dated Sept. 20, 1949. However, such reliance indicates an absence of fraudulent intent only when the agent has been provided with complete information from which an accurate return could have been prepared and there is no other evidence indicating fraudulent intent. Merritt v. Commissioner, 301 F.2d 484 (5th Cir. 1962), *177 affg. T.C. Memo. 1959-172. There are several problems with petitioners' placing all of the blame for their current predicament with Welsh. First, Welsh refused to testify at trial and failed to respond to a subpoena. The record was left open for 30 days after trial so that the parties could depose Welsh, but no depositions were submitted. Consequently, we have no way of corroborating petitioners' testimony regarding Welsh. In addition, petitioner's portrayal of himself as an innocent bystander is called into question by Robert Greene's testimony that petitioner was aware that Welsh would not complete returns correctly, and that petitioner hired Welsh specifically because petitioner believed Welsh could help petitioners avoid paying taxes. Petitioners' claims of ignorance are also called into question by the fact that even after switching to another accountant, VanSon, in 1983 or 1984, many taxable transactions were not reported and petitioners' returns were still incomplete. This strongly suggests that petitioners may have failed consistently to provide all relevant documents and information to their return preparers. VanSon also did not testify *178 at trial. Petitioner further undermined his credibility by testifying that he substantially overstated the value of his assets on financial statements that he submitted to his bank. He also admitted to placing properties in the names of other persons when it was financially or otherwise expedient to do so. A taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness to defraud the Commissioner. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). All we have with regard to petitioners' good faith reliance on Welsh is petitioner's testimony, and that is contradicted by the testimony of other witnesses and other evidence. It is well settled that we are not required to accept petitioners' self-serving testimony in the absence of corroborating evidence, particularly where the testimony is unreasonable, improbable, or questionable. Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), *179 affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992). Respondent argues that petitioner is estopped from denying that petitioners filed a fraudulent return for 1980, because of petitioner's criminal conviction under section 7206(1). We disagree. Petitioner's conviction under section 7206(1) does not collaterally estop him from denying that he fraudulently understated their tax liability for 1980; however, it is evidence to be considered by the trier of fact. Wright v. Commissioner, 84 T.C. 636 (1985). The conviction establishes that petitioner knowingly filed false returns understating gross income. Fed. R. Evid. 803(22). Though not dispositive, we find this evidence highly persuasive that petitioner intended to evade taxes in 1980. We find that there is ample evidence of intent to evade tax for the year 1980. In light of the record taken as a whole and reasonable inferences therefrom, we find that the facts *180 in these cases show by clear and convincing evidence that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes, and that the entire underpayments are attributable to fraud. We note, however, respondent has not met her burden of proof with respect to the allegations of fraud on the part of Mrs. House. We sustain respondent's determination of fraud with respect to petitioner for all the years in issue. Issue 11. Section 6661
Respondent determined that petitioners are liable for additions to tax under section 6661 for the taxable years 1982, 1983, 1984, and 1985. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. Pallottini v. Commissioner, 90 T.C. 498, 501 (1988). An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b). The amount of the understatement may be reduced under section 6661(b)(2)(B), for amounts adequately disclosed or supported by substantial authority. *181 Respondent's determination of the addition to tax is presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners make no argument with regard to substantial authority or adequate disclosure, and we find that no such argument exists. Petitioners contend, however, that respondent's failure to waive these additions to tax is an abuse of discretion. Based on this record we disagree with petitioners. If recomputation of petitioners' tax liabilities reflects substantial understatements, petitioners are liable for these additions to tax. Issue 12. Statute of Limitations
Petitioners argue that respondent is barred by the statute of limitations from assessing and collecting income taxes for the taxable years 1979, 1980, 1981, and 1982. The notice of deficiency was mailed more than 3 years from the respective dates on which the 1979, 1980, 1981, and 1982 returns were filed. Respondent's first defense to the bar of the *182 3-year statute of limitations contained in section 6501(a) is the exception for fraud contained in section 6501(c). The elements of fraud that respondent must prove under section 6501(c)(1) are the same elements for imposing a fraud penalty under section 6653(b). We already have held that respondent has proven that the underpayments for 1979, 1980, 1981, and 1982 are due to fraud; thus, the assessment of deficiencies and additions to tax for those years is not barred. While respondent did not succeed in proving that any part of the underpayments was due to the fraudulent behavior of Mrs. House, this failure does not affect the deficiencies determined against Mrs. House. As discussed below, there is no evidence demonstrating that Mrs. House is entitled to be relieved of liability for the deficiencies under section 6013(e) for the years in issue. Proof of petitioner's fraud also prevents the running of the statute of limitations as to Mrs. House with respect to the liabilities on their joint returns. Ballard v. Commissioner, 740 F.2d 659, 663 (8th Cir. 1984), affg. on this issue T.C. Memo. 1982-466; Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), *183 affd. 470 F.2d 87 (1st Cir. 1972); Barragan v. Commissioner, T.C. Memo. 1993-92. Because we have found that the exception for fraud is applicable in these cases, we do not need to discuss respondent's alternative argument that, with respect to 1981 and 1982 only, there were substantial omissions of items on the returns. Issue 13. Innocent Spouse
The last issue we must consider is whether Mrs. House should be relieved of liability for all of the years in issue under the innocent spouse provisions of section 6013(e). Spouses filing a joint return are jointly and severally liable for the tax arising therefrom. Sec. 6013(d)(3). The innocent spouse rule permits a spouse to avoid joint and several liability in certain cases. Sec. 6013(e). For Mrs. House to qualify as an innocent spouse, it must be established: (1) That a joint return was filed for each year in issue; (2) that there were substantial understatements of tax and that the understatements were attributable to grossly erroneous items of petitioner; (3) that, in signing the returns, she did not know or have reason to know of the substantial understatements; *184 and (4) that taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiencies and additions to tax. Sec. 6013(e)(1)(A),(D). Petitioners have the burden of proving each requirement of section 6013(e). Rule 142(a); Russo v. Commissioner, 98 T.C. 28, 31-32 (1992). A failure to prove any one of the requirements will preclude the spouse from relief. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Respondent apparently concedes that joint returns were filed and that the returns contain substantial understatements of tax attributable to grossly erroneous items of petitioner. Respondent argues, however, that Mrs. House knew or had reason to know of the substantial understatements, and that it would not be inequitable to hold her liable for the deficiencies and additions to tax. For the reasons stated below, we hold that Mrs. House does not qualify as an innocent *185 spouse. Mrs. House described petitioners' lifestyle as "average". For some of the years in issue petitioners lived in a rented apartment, and for some they lived in a house that they owned. Mrs. House testified that she traveled to Baltimore twice a year for medical reasons, but that petitioners did not take any vacations during the years in issue. Petitioners contend that Mrs. House never was present when Welsh prepared the returns and reviewed them with petitioner. On brief, petitioners argue that Welsh always asked them to sign blank returns, saying that he would transpose the numbers onto the signed copies. At trial, Mrs. House testified that she did not know if she signed the returns before or after they were completed. We will accept petitioners' argument that Mrs. House signed blank returns, and that she did not review the returns before they were filed, although Mrs. House's testimony was unclear on this point. Thus, assuming Mrs. House did not have actual knowledge of the substantial understatements of tax on petitioners' income tax returns for the years in issue, we must ascertain whether she had reason to know of the substantial understatements of tax. A taxpayer *186 has reason to know of a substantial understatement of tax if a reasonably prudent taxpayer in his or her position could be expected to know that the stated tax liability was erroneous or that further investigation was warranted. Kistner v. Commissioner, 18 F.3d 1521, 1525 (11th Cir. 1994), revg. T.C. Memo. 1991-463; Stevens v. Commissioner, supra at 1505; Bokum v. Commissioner, supra at 153. If the substantial understatement of tax is attributable to an omission of income, the spouse seeking relief has reason to know of the understatement if he or she has reason to know of the transaction that gave rise to the understatement. Guth v. Commissioner, 897 F.2d 441, 444 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Smith v. Commissioner, 70 T.C. 651, 673 (1978). We may impute to the spouse seeking relief constructive knowledge of the transaction if he or she turned a blind eye to facts within his or her reach that would have put a reasonably prudent taxpayer on notice to *187 inquire further. McCoy v. Commissioner, 57 T.C. 732, 734 (1972). It is well settled that Mrs. House would not qualify for section 6013(e) relief merely because she signed blank returns and relied on petitioner, Welsh, and VanSon to complete them properly. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Park v. Commissioner, T.C. Memo. 1993-252, affd. 25 F.3d 1289 (5th Cir. 1994). Mrs. House had a duty to review her completed income tax returns, and she is not relieved of that obligation because of her reliance on others to complete the return properly. United States v. Boyle, 469 U.S. 241, 251-252 (1985); Hayman v. Commissioner, supra at 1262; Park v. Commissioner, supra.Mrs. House, therefore, is deemed to have constructive knowledge of the contents of the returns, even though she signed the returns before they were prepared and did not review the completed returns before they were filed. Hayman v. Commissioner, supra; *188 Levin v. Commissioner, T.C. Memo. 1987-67. In determining whether the spouse seeking relief had reason to know of the substantial understatement of tax, courts generally consider, among other factors, the spouse's level of education. There is, however, no information in the record concerning Mrs. House's educational background. Courts also generally consider the spouse's involvement in the financial and business activities of the family. It does not appear that Mrs. House participated actively in the management or operation of petitioner's business and financial affairs; but there is evidence that Mrs. House was aware of many of petitioner's business activities. Mrs. House testified that she was aware of petitioner's residential construction business and that she went to closings with petitioner. Mrs. House also testified that she was aware of petitioner's involvement in several businesses, including the Trap, the Deck, the Jungle Prada, and the Executive Motor Lodge. Mrs. House admitted to signing petitioners' financial disclosure statement for 1983, which was submitted to their bank, although she stated that she did not review it before signing. *189 Petitioners' financial disclosure statement for 1983 shows a net worth of $ 3,382,200. Greene testified that Mrs. House was aware of the cash distributions petitioner received from Executive Motor Lodge because she accompanied petitioner when he came in to pick up his money. In addition, Greene stated that she left messages with Mrs. House when it was time for petitioner to collect his cash. In 1979, petitioners reported no gross income for the year. In 1980, petitioners reported gross income of $ 12,502.73. In 1981, petitioners reported no gross income. In 1982, petitioners reported gross income of $ 302.87. In 1983, petitioners reported gross income of $ 60,052. In 1984, petitioners reported gross income of $ 143,349. In 1985, petitioners reported gross income of $ 20,406. Petitioners reported gross receipts from petitioner's residential construction activity for only 2 of the 7 years in issue. Petitioners reported capital gains or losses in only 4 of the 7 years in issue. Petitioners' returns for 1979 to 1982, allegedly prepared by Welsh, are sloppy and provide very little information. For example, on petitioners' 1981 return, which reflects that petitioners had no *190 gross income, they reported wage income of $ 9,200, all from Executive Motor Lodge, interest income of $ 30,522.97, and a business loss of $ 41,722.25. The return contains a Form 1040, a Schedule A, a Schedule B, a Schedule C for the Jungle Prada, and a Schedule C for petitioner's residential construction business. On both Schedules C, the gross receipts reported are exactly equal to the cost of goods sold, and both schedules report substantial net losses. Petitioners' returns prepared by VanSon for years 1983, 1984, and 1985, although still not complete, are more detailed and report more income. Although the matter is not free from doubt, we believe that a reasonable person in Mrs. House's position would have had reason to know that the returns contained substantial understatements. In addition, we believe that Mrs. House knew enough about petitioner's business activities to know that petitioners were spending more money than was available to them and that further inquiry was required in light of the fact that so little information was provided on petitioners' returns. In light of all the facts and circumstances, we hold that Mrs. House had reason to know of the understatements *191 of tax for the years in issue. Having reached this conclusion, we need not dwell on the question of whether it would be inequitable to hold Mrs. House liable for the deficiencies. We believe that Mrs. House benefited from petitioner's unreported income and overstated deductions. Consequently, we are not persuaded that it would be inequitable to hold her responsible for the deficiencies for those years. We hold that Mrs. House fails the requirements of section 6013(e)(1)(C) and (D) and is not entitled to relief as an innocent spouse under section 6013(e) for the years in issue. In conclusion, we feel compelled to comment that these cases were poorly prepared for trial. The stipulations of fact, the backbone of trials in this Court, were incomplete. Books and records, in a trial where petitioners primarily had the burden of proof, were lost and could not be produced. Secondary evidence was fragmentary and generally confusing. Respondent's counsel undoubtedly shared some of our frustration, but we wonder whether more diligent efforts to work with petitioners' attorney might have produced a settlement of many, if not most, of the issues. We have done the best that we could with *192 this record. We expect the parties to attempt to resolve any further problems in the context of a Rule 155 computation. Decisions will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on $ 80,364.↩
1. 50 percent of the interest due on $ 87,798.37.↩
2. 50 percent of the interest due on $ 59,690.↩
3. 50 percent of the interest due on $ 71,187.35.↩
1. 50 percent of the interest due on the increased deficiency.↩
1. 50 percent of the interest due on the increased deficiency.↩
2. 50 percent of the interest due on the increased deficiency.↩
1. Respondent originally determined that petitioners' cost basis for 1985 was zero; however, the parties agreed prior to trial that the cost basis for 1985 is $ 50,000.↩
2. We note that on brief, respondent requests a finding of fact that petitioners received $ 2,700 in rental income from the Clements in 1981, which amount is $ 250 less than the amount stated in the statutory notice of deficiency ($ 2,950). Nevertheless, respondent used $ 2,950 everywhere else on brief when discussing the amount of rental income petitioners received from the property. Since respondent did not use $ 2,700 consistently on brief, we will assume that respondent did not intend to deviate from the statutory notice of deficiency and did not concede the additional $ 250.↩
3. It should be noted that, having determined that petitioners must report rental income from the Trap, respondent allowed petitioners substantial rental property expense and depreciation deductions for that property.↩
4. Respondent calculated petitioners' unrealized profit by calculating petitioners' gross profit percentage: Sale price for sale to Seavers
$ 50,000
Petitioner's purchase price (cost)
33,500
16,500
Gross profit percentage = $ 16,500 / $ 50,000 = 33% Respondent then multiplied petitioners' gross profit percentage by the amount respondent assumed petitioners did not receive from Seavers: Unrealized profit = 33% X $ 25,000 = $ 8,250↩
5. We note that the parties stipulated to a sentence stating "On January 18, 1980, Frank J. and Bernice L. Guida sold [7002 62d Avenue] to Dianne Greene." We assume that the date used in the quoted sentence is a mistake, and that the parties did not mean to differ from the date used in the deed, Oct. 1, 1980.↩